IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MARY ELIZABETH SANCHEZ,

        Plaintiff,

vs.                                                CIV No. 18-1125 LF

ANDREW M. SAUL,[1] Commissioner
of the Social Security Administration,

        Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on plaintiff Mary Elizabeth Sanchez's Motion to Reverse and Remand to Agency for Rehearing, with Supporting Memorandum (Doc. 27), which was fully briefed on August 23, 2019. *See* Docs. 27, 29, 30. The parties consented to my entering final judgment in this case. Docs. 27, 29, 30. Having meticulously reviewed the entire record and being fully advised in the premises, I find that the Administrative Law Judge (ALJ) failed to support her step-four findings with substantial evidence. I therefore GRANT Ms. Sanchez's motion and remand this case to the Commissioner for further proceedings consistent with this opinion.

### I.     Standard of Review

The standard of review in a Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether the correct legal standards were applied. *Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008). If substantial evidence supports the Commissioner's findings and the correct legal standards were applied, the Commissioner's

---

[1] Andrew M. Saul became the Commissioner of the Social Security Administration on June 17, 2019, and is automatically substituted as the defendant in this action. FED. R. CIV. P. 25(d).

decision stands, and the plaintiff is not entitled to relief. *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). "The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (internal quotation marks, brackets, and citation omitted).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* While the Court may not reweigh the evidence or try the issues de novo, its examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005). "'The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence.'" *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

## II.     Applicable Law and Sequential Evaluation Process

To qualify for disability benefits, a claimant must establish that he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a).

When considering a disability application, the Commissioner is required to use a five-step sequential evaluation process. 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At the first four steps of the evaluation process, the claimant must show: (1) the

claimant is not engaged in "substantial gainful activity"; (2) the claimant has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and* (3) the impairment(s) either meet or equal one of the Listings[2] of presumptively disabling impairments; *or* (4) the claimant is unable to perform his or her "past relevant work." 20 C.F.R. § 404.1520(a)(4)(i–iv); *Grogan*, 399 F.3d at 1260–61. If the claimant cannot show that his or her impairment meets or equals a Listing but proves that he or she is unable to perform his or her "past relevant work," the burden of proof shifts to the Commissioner, at step five, to show that the claimant is able to perform other work in the national economy, considering the claimant's residual functional capacity ("RFC"), age, education, and work experience. *Id.*

### III. Background and Procedural History

Ms. Sanchez was 29 years old at the time of her alleged onset of disability. AR 335.[3] She had earned her GED and lived in Rio Rancho, New Mexico with her husband and children. AR 40–41, 335, 450, 452. Previously, Ms. Sanchez worked as a dental assistant, cosmetic salesperson, and hostess. AR 21, 36–37. She stopped working after being laid off in 2008. AR 451. Although she began attending nursing school shortly thereafter, she wasn't able to continue because of her children's school schedule. AR 42.

On January 16, 2012, an orthopedic surgeon performed an operation on Ms. Sanchez's right hand to excise a three-centimeter mass in the palm of her hand and to perform a right open

---

[2] 20 C.F.R. pt. 404, subpt. P, app. 1.

[3] Document 24-1 is the sealed Administrative Record ("AR"). When citing to the record, the Court cites to the AR's internal pagination in the lower right-hand corner of each page, rather than to the CM/ECF document number and page.

carpal tunnel release. AR 689. Three years later, on April 27, 2015, Ms. Sanchez underwent a second surgery described as a "Revision of Open Median Nerve Decompression Right Carpal Tunnel." AR 540–43. Following her second surgery, Ms. Sanchez filed an application for Supplemental Security Income under Title XVI of the Social Security Act ("SSI"),[4] alleging disability since January 16, 2012, due to symptoms associated with the removal of the palmar mass from her right hand. AR 335, 423–31. Her date last insured was December 31, 2013, which was well before her second surgery. *Id.*

The Social Security Administration ("SSA") denied Ms. Sanchez's claim initially and on reconsideration. AR 334–52. Ms. Sanchez then requested a hearing before an ALJ. AR 364–65. On April 27, 2017, ALJ Ann Farris held a hearing. AR 16. ALJ Farris issued her unfavorable decision on October 30, 2017. AR 12–27.

The ALJ found that Ms. Sanchez met the insured status requirements of the Social Security Act through December 31, 2013. AR 17. At step one, she found that Ms. Sanchez had not engaged in substantial, gainful activity during the relevant period—from her alleged onset date of January 16, 2012, through her date last insured of December 31, 2013. *Id.* At step two, she found that Ms. Sanchez had the following severe impairments: "status post carpal tunnel syndrome repair right wrist and status post excision of mass from the right[] hand." *Id.* At step three, the ALJ found that none of Ms. Sanchez's impairments, alone or in combination, met or

[4] The record only contains an application for SSI. Doc. 423–31. There is no application in the record specifically for Disability Insurance Benefits under Title II of the Social Security Act ("DIB"). Despite Ms. Sanchez only having applied for SSI, "[w]hen the claimant (or proper applicant on the claimant's behalf) files a valid Title XVI application, he or she has also filed a valid Title II application. In this situation, both the Title XVI and Title II applications must be processed, adjudicated and effectuated." Program Operations Manual System ("POMS") SI 00601.035. The ALJ in this case analyzed Ms. Sanchez's claim pursuant to DIB standards; the ALJ did not determine whether Ms. Sanchez was entitled to SSI benefits. Ms. Sanchez does not raise this as a point of error.

medically equaled a Listing.  AR 17–18.  Because she found that none of the impairments met a

Listing, the ALJ assessed Ms. Sanchez's RFC.  AR 18.  The ALJ found that Ms. Sanchez had the

RFC to

> perform a wide range of light work as defined in 20 [C.F.R. §] 404.1567(b).  The
> claimant could only occasionally handle, finger, and feel with the right hand, which
> is the dominant hand.  She could generally use the right hand as a helper hand.

*Id.*

At step four, the ALJ concluded that Ms. Sanchez was not capable of performing her past

relevant work as a dental assistant, a cosmetic salesperson, or a hostess.  AR 21.  At step five,

she found that Ms. Sanchez was able to perform work that existed in significant numbers in the

national economy, including as an usher, furniture rental consultant, and a children's attendant.

AR 22.  The ALJ thus found Ms. Sanchez not disabled at step five.  *Id.*

Ms. Sanchez requested that the Appeals Council review the ALJ's unfavorable decision.

AR 1–3.  On October 4, 2018, the Appeals Council denied her request for review.  *Id.*  Ms.

Sanchez timely filed her appeal to this Court on December 3, 2018.  Doc. 1.[5]

## IV.    Ms. Sanchez's Claims

Ms. Sanchez raises three main arguments and several sub-arguments for reversing and

remanding this case.  She maintains that (1) the ALJ erred at step three by failing to properly

evaluate Listing 1.02; (2) the ALJ erred at step four by failing to properly evaluate her RFC,

including by failing to properly assess opinion evidence from both a treating physician and lay

source as well as failing to properly assess her complaints of pain; and (3) the ALJ erred at step

five by failing to properly evaluate whether 59,800 jobs in the national economy is a significant

number.  Doc. 27 at 5.

---

[5] A claimant has 60 days to file an appeal.  The 60 days begins running five days after the decision
is mailed.  20 C.F.R. § 404.981; *see also* AR 2.

## V.     Analysis

### A.     The ALJ's Evaluation of Listing 1.02

Certain impairments are considered severe enough to justify a presumption of disability in those who meet their criteria. Those impairments are set forth in an appendix of "Listed Impairments," at 20 C.F.R. pt. 404, Subpt. P, Appx. 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). At step three of the Sequential Evaluation Process, the ALJ considers whether any of a claimant's impairments "meets or medically equals" one of the listed impairments. If an impairment is found to meet or medically equal a listed impairment, it is conclusively presumed to be disabling, and there is no need for further analysis. *See* 20 C.F.R. § 404.1520(d).

Here, at step two, the ALJ found that Ms. Sanchez had the severe impairments of "status post carpal tunnel syndrome repair right wrist and status post excision of mass from the right[] hand." AR 17. Then, at step three, she purported to give "particular attention" to Listing 1.02. AR 18.

Listing 1.02, the listing applicable to the "major dysfunction of a joint," requires a claimant to show medical evidence of the following for a 12-month period:

> Gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effective, as defined in 1.00B2b; or
> B. Involvement of one major peripheral joint in each upper extremity (i.e. shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. pt. 404, subpt. P, app.1, § 1.02. For Ms. Sanchez to demonstrate that her impairment meets or equals this listing, she must "meet *all* of the specified medical criteria." *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). Indeed, "[a]n impairment that manifests only some of those

criteria, no matter how severe, does not qualify." *Id*. In addition, a claimant must provide

"specific medical findings" to support each of the requisite criteria for a particular impairment.

*Lax*, 489 F.3d at 1085.

As relevant here, Ms. Sanchez must show, among other criteria, the involvement of a

"major peripheral joint in *each upper extremity*." *See* 20 C.F.R. pt. 404, subpt. P, app.1,

§ 1.02(B) (emphasis added). While she references portions of the record that suggest she has

suffered pain and loss of fine and gross motor skills in her *right* hand, she does not do so with

respect to any major peripheral joint in her *left* upper extremity. Nor does she advance any

argument that her condition extends to both upper extremities. What is unclear, however, is

whether the ALJ's step-three finding actually hinged upon Ms. Sanchez's failure to show

involvement of *both* upper extremities.

Ms. Sanchez submits that the ALJ's analysis as to Listing 1.02 is "issue conclusive and

lacks a narrative explanation." Doc. 27 at 11. She maintains that the ALJ's finding that she does

not meet the requirements of Listing 1.02 is not supported by the evidence. *Id*. at 12. Instead,

she insists that the evidence demonstrates she was unable to effectively perform fine and gross

movements as a result of pain and numbness. *Id*. at 11 (citing AR 38, 40, 43–45, 501–03, 520,

527, 532, 535–36, 538, 542, 554, 564, 566–67, 595, 645, 650, 656, 661, 664, 668–69, 672, 674,

676–79, 701). Finally, Ms. Sanchez argues that the ALJ's decision concerning Listing 1.02 lacks

adequate analysis from which the Court may conclude that she applied the correct legal

standards. *Id*. at 12.

The ALJ's step-three findings are not a model of clarity or specificity. Instead, the ALJ

reasoned, quite generally, that "the specified criteria required of [Listing 1.02] was not

demonstrated by the available medical evidence." AR 18. She identified many of the criteria

required under Listing 1.02,[6] but she did not articulate why Ms. Sanchez's impairments did not meet those requirements. Further, her recitation of Listing 1.02's criteria involved a critical omission. She explained that the listing requires "involvement of one major peripheral joint resulting in inability to perform fine and gross movements effectively as defined in 1.00B2c." AR 18. Contrary to this explanation, however, Listing 1.02(B) requires "involvement of one major peripheral joint *in each upper extremity* (*i.e.*, shoulder, elbow, or wrist-hand)." 20 C.F.R. pt. 404, subpt. P, app.1, § 1.02 (emphasis added).

In an attempt to follow the ALJ's reasoning, the Court examines the definition found in Listing 1.00(B)(2)(c) to which the ALJ explicitly referred in her analysis. Listing 1.00, which covers musculoskeletal impairments in general, defines "loss of function" as either "the inability to ambulate effectively" or "the inability to perform fine and gross movements effectively" on a sustained basis. 20 C.F.R. pt. 404, subpt. P, app.1, § 1.00(B)(2)(a). It defines "inability to perform fine and gross movements effectively," in turn, as the "extreme loss of function of *both* upper extremities." *Id.* Thus, Listing 1.00(B)(2)(c) is consistent with Listing 1.02(B). These listings require involvement of *both* upper extremities. Ms. Sanchez does not contend that there was, in fact, involvement of both of her upper extremities. Thus, the Court agrees with the ALJ that "the specified criteria required of [Listing 1.02] was not demonstrated by the available medical evidence." Further, because Ms. Sanchez has not satisfied all of Listing 1.02's criteria, she cannot prevail at step three as a matter of law. *See Sullivan*, 493 U.S. at 530.

---

[6] The ALJ noted that Listing 1.02 requires "gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected join(s), and finding on appropriate medically acceptable imaging of joint space narrowing, bony destruction or ankylosis of the affected joint." AR 18.

Even if the ALJ erred in providing only conclusory findings at step three or in applying the wrong legal standard, her errors were harmless. Ms. Sanchez fails to show that a reasonable administrative fact-finder, relying on and adequately discussing the evidence to which she cites, could have found involvement of both of her upper extremities, meeting Listing 1.02. The Court will not remand on this ground.

B.      The ALJ's Evaluation of the RFC

At step four, Ms. Sanchez argues that the ALJ failed to properly evaluate opinion evidence—opinions from both her treating physician and the Third Party Function Report from her mother-in-law. Additionally, she insists that the ALJ failed to properly evaluate her own complaints of pain. Doc. 27 at 5.

1.      *The ALJ's Evaluation of Treating Source Opinion*

Ms. Sanchez contends that the ALJ failed to properly assess the opinion of Matthew W. Patton, M.D., her treating orthopedic surgeon. Doc. 27 at 16. Treating physicians may offer a medical opinion regarding the claimant's symptoms, diagnosis, and prognosis, as well as work-related physical and mental limitations. *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994) (citing 20 C.F.R. § 404.1527(a)(2)). "[M]edical opinion[s]" are statements "from acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [their] symptoms, diagnosis and prognosis, what [they] can still do despite impairment(s), and [their] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1). Pursuant to the "treating physician rule,"[7] "the Commissioner will generally

_____

[7] Although the Social Security Administration has rescinded the treating physician rule, it remains applicable to cases filed before March 27, 2017. Because Ms. Sanchez filed her claim in June 2015, the treating physician rule still applies. *See* SSR 96-2P, 2017 WL 3928298 (Mar. 27, 2017).

give more weight to medical opinions from treating sources than those from non-treating

sources." *Langley*, 373 F.3d at 1119.

When presented with a treating medical source opinion, as here, the ALJ first must

determine whether the opinion is entitled to "controlling weight," and if not, "treating source

medical opinions are still entitled to deference and must be weighed using all of the factors

provided in § 404.1527." *Id.* Those factors include:

> (1) the length of the treatment relationship and the frequency of examination;
> (2) the nature and extent of the treatment relationship, including the treatment
> provided and the kind of examination or testing performed; (3) the degree to
> which the physician's opinion is supported by relevant evidence; (4) consistency
> between the opinion and the record as a whole; (5) whether or not the physician is
> a specialist in the area upon which an opinion is rendered; and (6) other factors
> brought to the ALJ's attention which tend to support or contradict the opinion.

*Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003); *see also* 20 C.F.R. § 404.1527(c)(2–

6). While an ALJ is not required to discuss each factor, she "must give good reasons . . . for the

weight assigned to a treating physician's opinion, reasons that are sufficiently specific to make

clear to any subsequent reviewers the weight the adjudicator gave to the treating source's

medical opinion and the reason for that weight." *Langley*, 373 F.3d at 1119 (internal quotation

marks and citation omitted). Further, an ALJ must give specific, legitimate reasons for rejecting

a treating physician's opinion completely. *Id.*

Here, the ALJ gave "little weight" to the opinion of Dr. Patton. AR 20. She explained

that she did so because (1) "Dr. Patton only checked the box on a form and did not elaborate on

[Ms. Sanchez's] capabilities"; (2) "the form was dated well after the date last insured"; and (3)

Dr. Patton's opinion "was not supported by objective medial evidence." AR 20 (citing AR 623).

Having reviewed the form to which the ALJ refers, as well as Dr. Patton's treatment notes and

the record as a whole, the Court finds that some of the ALJ's critiques of Dr. Patton's opinion are

fair and reasonable. One, however, is neither supported by substantial evidence or sufficiently specific to make clear to subsequent reviewers why the ALJ discounted Dr. Patton's opinion on that basis.

First, in the "Physician's Certification" portion of Ms. Sanchez's application for discharge of student loan debt, Dr. Patton checked "yes" in response to the following question:

> Does the applicant have a medically determinable physical or mental impairment that (a) prevents the applicant from engaging in any substantial gainful activity, in any field of work, and (b) can be expected to result in death, or has lasted for a continuous period of not less than 60 months, or can be expected to last for a continuous period of not less than 60 months?

AR 623. Additionally, he offered the following diagnosis of Ms. Sanchez's impairment: "354.0." AR 623. The Commissioner surmises that "354.0" is actually an insurance code, despite the form's admonition not to "use abbreviations or Insurance codes." Doc. 29 at 15; AR 623. Dr. Patton's opinion on this form provides no further information. He does not identify any of Ms. Sanchez's limitations, nor does he describe the severity of her condition.

Ms. Sanchez concedes that the "information on Dr. Patton's signature page was limited" but maintains that the ALJ nevertheless was required to evaluate this treating physician's opinion that she was unable to work. Doc. 27 at 16 (citing 20 C.F.R. § 404.1527(c); SSR 96-8p, 1996 WL 374184 (July 2, 1996)). The Commissioner submits that "Dr. Patton's conclusion of disability was a matter reserved to the Commissioner and not entitled to any special treatment." Doc. 29 at 16. While it is true that Dr. Patton's conclusion does not deserve special treatment, it is equally true that the opinion may not be disregarded altogether simply because he reached an issue reserved to the Commissioner. *See* SSR 96-5p, 1996 WL 374183, at *1–2, 5 (July 2, 1996) (explaining that "adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner"). And although the

ALJ ultimately discounted Dr. Patton's opinion, she did not do so on the basis that that the opinion covered an issue reserved to the Commissioner.

The Commissioner suggests that Dr. Patton's treatment notes from the day he issued the "Physician's Certification" provide more detail regarding his opinion concerning Ms. Sanchez's ability to work. In those notes, Dr. Patton recommended that Ms. Sanchez participate in formal occupational therapy and use a custom splint at night, and he opined as follows:

> Because patient has had persistent symptoms after very rare problem with the myositis ossificans at the level of the carpal tunnel and permanent median nerve is to be shin [sic] symptoms causing numbness and weakness[,] I certainly think is reasonable to say that the patient is not going to be able to have gainful employment as a dental assistant using the right hand. There is a high likelihood that her symptoms in residual deficits of the right hand will be permanent.

AR 526. But, notably, Dr. Patton's opinion that Ms. Sanchez was unable to perform her previous work does not equate to an opinion that she was disabled. *See* 42 U.S.C. § 423(d)(2)(A) (providing that a claimant is not disabled unless she "is not only unable to do [her] previous work but cannot . . . engage in any other kind of substantial gainful work"). Indeed, the ALJ herself agreed that Ms. Sanchez could not work as a dental assistant and yet reached an unfavorable disability determination. AR 21–22. By contrast, the opinion contained within Dr. Patton's Physician's Certification *does* constitute an opinion that Ms. Sanchez is disabled. However, the ALJ explicitly considered that opinion and afforded it "little weight," articulating three reasons for its rejection. AR 20. The Court considers whether the reasons offered by the ALJ were specific and legitimate. *See Langley*, 373 F.3d at 1119.

Regarding the ALJ's explanation that "Dr. Patton only checked the box on a form and did not elaborate on [Ms. Sanchez's] capabilities," AR 20, the Court agrees that the Physician's Certification is entirely devoid of details. Even the more detailed treatment notes from the same day fail to articulate Dr. Patton's impressions of Ms. Sanchez's capabilities, other than to reach

the conclusion that she was unlikely to be capable of resuming her previous employment as a dental assistant. AR 526. A thoroughly explained and supported opinion is entitled to more weight. *See* 20 C.F.R. § 404.1527(c). Conversely, an opinion unaccompanied by thorough explanation or support, like the one offered by Dr. Patton, may be discounted. *See id.*; *see also Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987) (reasoning that check-the-box style evaluation forms, "unaccompanied by thorough written reports or persuasive testimony, are not substantial evidence"); *Chapo v. Astrue*, 682 F.3d 1285, 1289 (10th Cir. 2012) (concluding that the ALJ "properly gave no weight to [a] conclusory form, which lacked any functional findings"). The ALJ's critique of Dr. Patton's less-than-thorough opinion was a reasonable one.

As the ALJ highlighted in her decision, Dr. Patton's opinion was offered on June 3, 2015, a year and a half after Ms. Sanchez's date last insured. The Court agrees with the Commissioner that the relevant analysis for an ALJ is typically whether the claimant was disabled *before* her date last insured, not after. *See Potter v. Sec'y of Health & Human Servs.*, 905 F.2d 1346, 1348–49 (10th Cir. 1990). A medical opinion authored after the date last insured *sometimes* bears on the nature and severity of a claimant's condition within the relevant period. *See, e.g.*, *Hamlin v. Barnhart*, 365 F.3d 1208, 1217 (10th Cir. 2004) (holding that the ALJ erred by neglecting to discuss an RFC evaluation authored by a treating source after the claimant's date last insured, where the evaluation covered the relevant period); *Baca v. Dep't of Health & Human Servs.*, 5 F.3d 476, 579 (10th Cir. 1993) (reasoning that evidence that bears upon a plaintiff's condition after his date last insured is "pertinent evidence" that may "disclose the severity and continuity of impairments existing before the earning requirement date"). Nevertheless, the Court cannot say that in this case it was unreasonable for the ALJ to discount Dr. Patton's opinion because it

was offered well outside of the relevant period, particularly where Dr. Patton made no suggestion that his opinion related back to the relevant period. This reason, too, was specific and legitimate.

Finally, the ALJ explains that she discounted Dr. Patton's opinion on the basis that it was "not supported by objective medical evidence." AR 20. In reaching this conclusion, Ms. Sanchez argues that the ALJ neglected to consider all of the record evidence or to discuss probative contrary evidence that she rejected. Doc. 27 at 16. Instead, she asserts that the ALJ picked and chose information to support her findings, ignoring contrary evidence that would support a finding of disability. *Id*. Ms. Sanchez submits that the "ALJ had to comb through the record to find normal examination findings, which are mostly citations to visits unrelated to Ms. Sanchez's right hand complaints." *Id*. The Court agrees with Ms. Sanchez that the ALJ's discussion of the medical record was inadequate.

The ALJ noted, first, that examinations of Ms. Sanchez's right upper extremity in July 2013 "revealed no gross deformities" and "no sign[s] of infection." AR 19 (citing AR 501). She recounted that Ms. Sanchez's fingers were "well perfused with less than two-second capillary refill despite her allegations of pain." AR 19. While Ms. Sanchez apparently suspected that a mass had returned to her right hand following excision of a palmar mass, the ALJ emphasized that this was not confirmed by an MRI. AR 19 (citing AR 501). Further, although the records indicated that Ms. Sanchez was "extremely sensitive over the surgical scar" following her first hand surgery, the ALJ emphasized that there was "no sign of swelling or ecchymosis." AR 19 (citing AR 503).

The ALJ also discussed a number of normal physical findings entirely unrelated to impairments in Ms. Sanchez's right hand and wrist. For example, she noted that Ms. Sanchez was "negative for high blood pressure, diabetes, bleeding problems, asthma, ulcers, kidney

problems, thyroid problems, headaches, dizzy spells, visual disturbances, and chest pains." AR 19. And she highlighted normal findings with respect to Ms. Sanchez's orientation, insight, judgment, cardiovascular system, gait, and posture. AR 19.

Relevant to Ms. Sanchez right hand and wrist impairment, the ALJ noted that a manual muscle test on July 3, 2013, revealed 5/5 strength in Ms. Sanchez's right upper extremity. AR 19 (citing AR 515). She emphasized that records during this timeframe revealed no deformities, no fractures, no dislocations, no foreign bodies, and no remarkable mineralization. AR 19 (citing 515–19). She recounted that "[r]adiology results showed no findings to explain [etiology] of symptoms." AR 19 (citing 519). At the same time, however, she acknowledged that "[a]n electro diagnostic study revealed evidence of mild right medial motor nerve neuropathy constituent with carpal tunnel syndrome." AR 19 (citing AR 515).

Next, the ALJ discussed records purportedly from October 2013, observing that an MRI of Ms. Sanchez's right hand and wrist revealed "normal postoperative changes from carpal tunnel surgery with unchanged and very mild scar tissue" as well as "minimal residual postoperative changes [with] [n]o advancement with gadolinium." AR 19 (citing AR 524, 534). The Court's examination of these records reveals, however, that they were not from October 2013, as the ALJ represented, but from March 2014, after Ms. Sanchez's date last insured and just before she underwent revision of open median nerve decompression in her right carpal tunnel. *See* AR 524–34, 634.

Next, the ALJ correctly observed that Ms. Sanchez received an injection in her right carpal tunnel on January 21, 2014. AR 19–20 (citing AR 536). She went on to discuss records which she indicated were from visits to New Mexico Orthopedics in April 2017, a time period well after Ms. Sanchez's December 31, 2013 date last insured. AR 20. The ALJ again misstated

the dates of these records. In fact, only one of the three records cited by the ALJ was from 2017. *See* AR 633–36. And not only did she misrepresent the dates of these records; she misrepresented their content. For instance, she indicated that the February 21, 2017 record from Floyd L. Pacheco, DPM,[8] a doctor of podiatric medicine, showed normal muscle strength as well as a normal physical examination. AR 20 (citing AR 634). But this observation is misleading. The Court's review of the record reveals that the purpose of Dr. Pacheco's examination was to address right *foot* pain and possible fracture, not symptoms related to Ms. Sanchez's right upper extremity. AR 633. Indeed, there is no indication within that record that Ms. Sanchez's right upper extremity was examined or even discussed at this visit with her podiatrist. *See* AR 633– 36.

The ALJ also suggested that Ms. Sanchez reported hand and wrist pain at a level of 3/10 in April 2017. AR 20 (citing AR 650). Yet, the record to which the ALJ referred was actually from four years earlier, in March 5, 2013. *See* AR 650. Finally, the ALJ reported that Ms. Sanchez had "good" finger and thumb range of motion in her right hand in April 2017. AR 20 (citing AR 661). But this report was from even earlier in Ms. Sanchez's medical history: June 1, 2012. *See* AR 661.

The ALJ's significant misstatements in her medical records chronology undermine her conclusion that the records were inconsistent with Dr. Patton's opinion. Notably, Ms. Sanchez underwent two separate surgeries to address symptoms with her right upper extremity, and the ALJ's discussion of her records conflate the time periods surrounding these two surgeries. But even more significantly, the relevant period for purposes of the ALJ's disability determination

---

[8] "DPM" refers to a doctor of podiatric medicine, or a medical specialist who addresses medical problems affecting patients' feet and lower legs. *See What is a Podiatrist?*, WebMD, https://www.webmd.com/ diabetes/podiatrist-facts#1 (last visited Dec. 9, 2019).

for DIB does not extend beyond December 31, 2013. It is unclear from the ALJ's decision whether she disregarded, in her weighing of Dr. Patton's opinion, the records she reported were from 2017. It is possible that she considered these records in her weighing of this opinion but attributed them to the wrong time period. Either way, an accurate chronology of Ms. Sanchez's medical records was critical to the ALJ's evaluation of Dr. Patton's opinion and, more generally, to the ALJ's RFC determination. In the absence of an accurate chronology, the Court is not satisfied that substantial evidence supports the ALJ's finding that Dr. Patton's opinion is inconsistent with the record. For this reason, and those that follow, remand is warranted. On remand, the ALJ should re-evaluate the consistency of Dr. Patton's opinion, paying particular attention to the pertinent dates of the record evidence.

2.      *The ALJ's Evaluation of Lay Source Opinion*

Next, Ms. Sanchez submits that the ALJ failed to properly evaluate the Third Party Function Report of Vivian Weidner, Ms. Sanchez's mother-in-law, in accordance with SSR 06-3p. Doc. 27 at 17. The ALJ found Ms. Weidner's function report to be "generally consistent with statements made by the claimant," summarizing Ms. Weidner's statements as follows:

> [Ms. Sanchez] is able to care for her husband and children. Furthermore, she . . . takes full responsibility for the animals. . . [and] was capable of driving a car and shopping in stores. Socially, [she] engaged in family functions and went to school meetings with her husband on behalf of her children.

AR 20 (citing AR 458–66). Ms. Sanchez acknowledges that the ALJ set out the appropriate standard for reviewing a Third Party Function Report. Doc. 27 at 17. Because she was a non-medical source, the ALJ properly considered Ms. Weidner's statements as those of an "other source." AR 20 (citing 20 C.F.R. §§ 404.1513(a) & (d); 416.913(a) & (d); SSR 06-03p). When evaluating "other source[s]," an ALJ need only explain the weight given to opinions and ensure that her decision allows a subsequent reviewer to follow her reasoning. *See Mounts v. Astrue*,

479 F. App'x 860, 866 (10th Cir. 2012) (unpublished).  Accordingly, the Court considers

whether the ALJ met this standard with respect to her assessment of Ms. Weidner's Function

Report.

The ALJ explained that she gave "only limited weight" to Ms. Weidner's statements

because of "their inconsistency with the objective medical evidence and medical opinions of

record."  AR 20.  At the same time, though, she also purported to give "more weight" to Ms.

Weidner's statements concerning Ms. Sanchez's activities of daily living "due to the longitudinal

nature of their relationship."  AR 20.  According to Ms. Sanchez, the ALJ improperly considered

Ms. Weidner's Function Report because she failed to consider critical aspects of Ms. Sanchez's

reported activities of daily living:

> that Ms. Sanchez needs help from her husband to get the family ready, her
> husband and children take full responsibility for their animals, she has problems
> with personal hygiene due to limited use of the right hand, her husband prepares
> meals, and she cannot go out alone while in pain or to the grocery store.

Doc. 27 at 17 (citing AR 20, 458–66).  To be sure, Ms. Sanchez's characterization of Ms.

Weidner's Function Report is more accurate than that of the ALJ.  The ALJ stripped Ms.

Weidner's statements of many of their original qualifications, and, in some cases, she completely

misstated them.  For instance, the ALJ found Ms. Weidner to say that Ms. Sanchez took

responsibility for the family's pets.  In reality, Ms. Weidner reported the opposite—that "[Ms.

Sanchez's] husband and children take full responsibility of animals."  *See* AR 459.  Additionally,

while the ALJ found Ms. Weidner to indicate that Ms. Sanchez is "able to care for her husband

and children," the Function Report more accurately indicates that Ms. Sanchez "attempts" to care

for her husband and children but that her husband "has to get children, self and wife going" as

well as prepare and plan for the family's meals.  AR 458–59.  Ms. Weidner went on to explain

that "[Ms. Sanchez's] husband and children help and do dinners, yardwork and anything else

needed," and Ms. Sanchez doesn't do house or yard work because of "pain in hand and no strength in hand." AR 461. According to the ALJ, Ms. Weidner reported that Ms. Sanchez was capable of driving a car, shopping in stores, engaging in family functions, and going to school meetings. But Ms. Weidner's report stated that Ms. Sanchez cannot go out alone when she is in pain. AR 460–61. The ALJ makes no reference to any difficulties with personal hygiene even though Ms. Weidner explained that Ms. Sanchez was unable to dry or style her hair and that "personnal [sic] care . . is an obvious visible struggle." AR 459. Finally, the ALJ's finding that Ms. Weidner's statements were "generally consistent with statements made by the claimant" is also problematic. In stark contrast to Ms. Weidner's reports, Ms. Sanchez reported in her own Function Report that she prepares her own meals on a daily basis (AR 555), cares for pets by letting them out of their cages and putting them back in (AR 554), and did not need anyone to accompany her on errands (AR 557).

Indeed, it is difficult to reconcile the ALJ's description of Ms. Weidner's Third Party Function Report with the statements actually contained Weidner's report. Further, the weight the ALJ assigned to the Function Report is not straightforward. The ALJ purported to give the Third Party Function Report "only limited weight," except as to statements concerning Ms. Sanchez's activities of daily living, to which she accorded "more weight." Of course, as discussed above, the activities of daily living are largely misstated or mischaracterized.

The Commissioner suggests that the ALJ's errors do not require reversal, because "minor factual discrepancies . . . do not serve as a basis for reversal where, as here, the ALJ's decision is otherwise supported by substantial evidence." Doc. 29 at 20, n.6 (quoting *Todorova v. Comm'r, SSA*, No. 18-2082, 2019 WL 410203, at *3 (10th Cir. Jan. 31, 2019)). The Court disagrees with the Commissioner's characterization of the ALJ's errors as "minor factual discrepancies."

Rather, the number and significance of the errors in the ALJ's analysis render the Court unable to follow her reasoning. Ultimately, the Court concludes that the ALJ's findings as to Ms. Weidner's Third Party Function Report are erroneous and unsupported by substantial evidence. The Court will reverse on this ground. *See Black v. Berryhill*, Civ. No. 17-0153 JNP/EJF, 2018 WL 1472525, at *19 (D. Utah Mar. 7, 2018) (recommending remand due to misstatements in the ALJ's discussion of a third party function report, concluding that "[w]hile the ALJ could reasonably assign less weight to [the] third party function report, he cannot do so based on a mischaracterization of the report's contents"); *see also Black v. Berryhill*, Civ. No. 17-0153 JNP/EJF, 2018 WL 1468573, at *1 (D. Utah Mar. 23, 2018) (Order Adopting Report and Recommendation).

### 3. *The ALJ's Evaluation of Complaints of Pain*

Ms. Sanchez asserts that the ALJ also failed to properly evaluate her allegations of symptoms in accordance with Social Security Ruling 16-3p, 2017 WL 4180304 (Oct. 25, 2017). Doc. 27 at 14. Social Security Ruling 16-3p defines the two-step process that an ALJ must use to evaluate a claimant's symptoms. SSR 16-3p, 2017 WL 5180304, at *3–5. At the first step, the ALJ "consider[s] whether there is an underlying medically determinable physical or mental impairment[] that could reasonably be expected to produce [the] individual's symptoms, such as pain." *Id*. at *3. At the second step, after finding such an impairment, the ALJ "evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit [the] individual's ability to perform work-related activities . . . ." *Id*. The ALJ considers the evidence of record, statements by the claimant, statements by medical and non-medical sources, and the factors enumerated in 20 C.F.R. § 404.1529(c)(3), which include:

1. Daily activities;
2. The location, duration, frequency, and intensity of pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms . . . ; and
7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

2017 WL 5180304, *7–8. The Commissioner submits that "the ALJ provided a thorough description of Ms. Sanchez's testimony and alleged symptoms." Doc. 29 at 17 (citing AR 18– 19). The ALJ did recount the following statements regarding the "intensity, persistence, and limiting effects" of Ms. Sanchez's symptoms:

> The claimant alleged disability due to a tumor removed from the right-hand, loss of movement, constant pain, numbness, and insomnia. She testified to having limitations with her right upper extremity. Then, she reported that she suffered from a car accident in 2013. The claimant testified that "almost everything" made her symptoms worse. Further, she reported that her symptoms were exacerbated by cooking, homework projects, and driving. She indicated that she had her first surgery in 2012 and a revision in 2015. The claimant testified that she was able to drive with her left hand. Then, she indicated that she could use a computer and had to operate the mouse with her left hand. The claimant stated that she engaged in physical therapy and more braces but her treatment did not help her symptoms. She reported numbness in her hand. In addition, she stated that she was unable to do chores due to ongoing pain. She stated that she uses her left hand is [sic] much as possible. The claimant indicated having problems with her grip strength.

AR 18–19 (citations omitted). Although the ALJ determined that Ms. Sanchez's "medically determinable impairments might be expected to cause some of the alleged symptoms," she concluded that Ms. Sanchez's "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence." AR 20. The ALJ provided at least four reasons for this finding.

First, she suggested that Ms. Sanchez's allegations were inconsistent with her level of activity, noting that Ms. Sanchez transported her kids to and from school, helped them as much

as she could, and exercised using a stationary bike and treadmill.  AR 20; *see* AR 41.  The ALJ explained that Ms. Sanchez was "able to accomplish her normal activities of daily living using primarily her left upper extremity."  AR at 21.  Indeed, the record includes statements by Ms. Sanchez indicating that she makes lunches for her children (AR 554), does light cleaning (AR 554), does laundry (AR 43, 554–55), makes beds (AR 555), vacuums (AR 43, 555), mops (AR 555), washes some dishes (AR 555), drives (AR 556), shops for food and personal care items (AR 556), helps her children with homework (AR 554), handles finances (AR 556), makes simple meals on a daily basis (AR 43, 555), uses the computer (AR 40), and teaches Zumba, often engaging in vigorous exercise six to nine times per week (AR 576–77, 580).

Nevertheless, Ms. Sanchez contends that the ALJ's reliance on her daily activities was inappropriate, given the frequency with which she sought care for the pain in her hand and wrist. Doc. 27 at 14.  While it is true that the record demonstrates that Ms. Sanchez consistently sought care for pain in her hand and wrist, it is equally true that her activity level could be viewed as inconsistent with her allegations of disability.  The ALJ was required to consider Ms. Sanchez's reported activities in evaluating her subjective complaints of pain and disabling symptoms.  She did so, and her finding that Ms. Sanchez's complaints were inconsistent with her daily activities was supported by substantial evidence.  *See* 20 C.F.R. § 404.1529(c)(3)(i) (indicating that activities of daily living are "an important indicator of the intensity and persistence of [a claimant's] symptoms").

Next, the ALJ observed that Ms. Sanchez took only non-prescription-strength medication for pain, which the ALJ described as "conservative" treatment.  AR 21.  Acknowledging Ms. Sanchez's testimony that she preferred not to take narcotics for pain, the ALJ reasoned that her failure to take narcotics "suggests that there is more [that] she could do in order to relieve her

symptoms." AR 21. While there may be more than one reason for a claimant to avoid taking narcotics, "type of treatment" remains one factor, among many, that an ALJ is to consider in evaluating claims of disabling symptoms. *See* 20 C.F.R. § 404.1529(c)(3)(iv)–(v). Relatedly, the ALJ noted that after her initial surgeries, Ms. Sanchez had not undergone any additional invasive treatments. AR 21. And she acknowledged that Ms. Sanchez previously participated in physical therapy, used braces at night, and received injections of Kenalog, but that these forms of treatment failed to help relieve her symptoms. AR 19–21. Although the Court may not have drawn the same conclusion from the type of treatment Ms. Sanchez used to address her pain, it is, nevertheless, satisfied that the ALJ reasonably considered the use of relatively conservative treatment in evaluating Ms. Sanchez's complaints of pain.

The ALJ also emphasized that Ms. Sanchez's prior employment and schooling ended for reasons other than disability. AR 20–21. She explained that Ms. Sanchez "was let go from her last job and tried finding another job" and left a subsequent job "because her husband['s] schedule changed and she had to be the transporter for her kids to school." *Id*. More precisely, Ms. Sanchez testified that she stopped working as a dental assistant for UNMH Dental in 2009 because she was "let . . . go, within [her] probationary period." AR 41. She unsuccessfully attempted to find another job, and then commenced nursing school at CNM. AR 41–42. However, Ms. Sanchez failed to complete nursing school because her husband's schedule changed, and she needed to be available to transport her children to and from school. AR 42.

A claimant's "prior work record" is properly considered when evaluating subjective complaints of pain and disabling symptoms. *See* 20 C.F.R. § 404.1529(c)(3) (instructing ALJs to consider, among other evidence, "information about [a claimant's] prior work record" in evaluating a claimant's symptoms). The ALJ's consideration of the non-disability-related

reasons Ms. Sanchez stopped working was proper, and her finding that Ms. Sanchez's work history "is inconsistent with filing a disability claim" is supported by substantial evidence. AR 20.

Finally, the ALJ found that the medical record "fail[ed] to provide strong support for the claimant's allegations of disabling symptoms and limitations." AR 19. Indeed, the ALJ suggested that Ms. Sanchez's "physical examination results were virtually normal." *Id.* (citing AR 503). But, as with the ALJ's rejection of Dr. Patton's opinion, the ALJ's significant misstatements in the medical records chronology also undermine her conclusion regarding the supportability of Ms. Sanchez's complaints of pain and symptoms.

Further, the Court questions whether the ALJ's reliance on reports of normal physical examination findings, including at medical visits where hand and wrist symptoms were not even discussed, was reflective of Ms. Sanchez's medical record. The record reveals a claimant who consistently reported pain and numbness in her right hand and who persistently sought treatment in the form of surgeries, injections, and therapy. Her records include reports of significant palm pain (*see, e.g.*, AR 536), reports of reduced grip strength, pinch strength, and range of motion in the right hand and wrist (AR 520, 597–98, 650, 672, 674), and statements that she will likely have permanent residual pain, numbness, and deficits in her right hand and wrist (AR 526, 564, 650). The ALJ's citations to portions of the record suggesting minimal pain and symptoms in Ms. Sanchez's right hand, and her emphasis of the lack of physical deformities or visible abnormalities, fail to account for certain symptoms and limitations referenced throughout the medical records.

Because the ALJ inaccurately reported Ms. Sanchez's right-hand medical history and ignored evidence suggesting that she suffered from significant symptoms and limitations in the

use of her right hand, the Court concludes that the ALJ's finding—that Ms. Sanchez's complaints were inconsistent with the medical record—was erroneous and not supported by substantial evidence. *See Hamlin*, 365 F.3d at 1221 (determining that the claimant's subjective complaints and pain had adequate support in the record, but the ALJ's conclusions did not, where the medical records were "replete with . . . reports of pain and of prescriptions and refills for medication"). Nor can the Court find the ALJ's step-four errors to be harmless where an accurate understanding of Ms. Sanchez's medical record might support restrictions of less than occasional use of her right hand.[9] After all, a vocational expert testified at Ms. Sanchez's *de novo* hearing that a person would be unable to perform the jobs she identified at step five if that person had less than occasional use of her right dominant hand. AR 48. The Court will remand on this issue. On remand, the ALJ should take care to thoroughly consider and more accurately discuss Ms. Sanchez's medical records.

C.      The ALJ's Evaluation of the Number of Jobs in the National Economy

Ms. Sanchez contends that the ALJ failed to supply adequate analysis for her finding that 59,800 jobs in the nation economy is a significant number upon which to base a denial of disability benefits at step five. However, because the ALJ's analysis at step five may be affected by her step four analysis on remand, the Court will not reach this issue. *See Watkins*, 350 F.3d at 1299.

---

[9] Notably, the Commissioner has not developed any argument to the effect that errors by the ALJ in evaluating Ms. Sanchez's subjective complaints were harmless. The Court will not supply this argument on the Commissioner's behalf.

## VI.    Conclusion

For the reasons stated above, I find the ALJ erred at step four and that her findings are not supported by substantial evidence.  The Court remands this case based on the ALJ's step-four errors and declines to reach the errors Ms. Sanchez asserts with respect to the step-five analysis.

IT IS THEREFORE ORDERED that Ms. Sanchez's Motion to Reverse and Remand to Agency for Rehearing (Doc. 27) is GRANTED.

IT IS FURTHER ORDERED that the Commissioner's final decision is REVERSED, and this case is REMANDED for further proceedings in accordance with this opinion.

Laura Fashing
United States Magistrate Judge
Presiding by Consent